Victor BUSSIE et al.

v.

The GOVERNOR OF LOUISIANA et al.

Emmitt J. DOUGLAS et al.

v.

John J. McKEITHEN, Individually and as Governor of Louisiana, et al.

Dorothy TAYLOR et al.

v.

John J. McKEITHEN, Governor of Louisiana, et al.

Carroll G. MILLER et al.

v.

GOVERNOR OF LOUISIANA et al.

Victor BUSSIE et al.

v.

The GOVERNOR OF LOUISIANA et al.

Civ. A. Nos. 71–202, 71–206, 71–234, 71–235, 71–259.

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

Sept. 10, 1971.

Murphy W. Bell T/A, Robert C. Williams, Robert Judge Eames, Baton Rouge, La., for plaintiffs Douglas and others.

Robert F. Collins, TA, Collins & Douglas, Stanley A. Halpin, Jr., Elie, Bronstein & Strickler, New Orleans, La., for plaintiffs Taylor and others.

Adams & Reese, Sam A. Le Blanc, III, New Orleans, La., for plaintiffs Miller and others.

Sam A. Le Blanc, III, New Orleans, La., Camille F. Gravel, Jr., Gravel, Roy & Burnes, Alexandria, La., for plaintiffs Bussie and others.

Jack P. F. Gremillion, Atty. Gen., Kenneth C. DeJean, Thomas W. McFerrin, Baton Rouge, La., for all defendants except Republican Committee.

Martin L. C. Feldman, Nat G. Kiefer, Michael O'Keefe, Adrian Duplantier, New Orleans, La., for defendant, Republican State Central Committee.

E. GORDON WEST, Chief Judge.

## BACKGROUND

In 1966 a suit was filed in this Court involving "the right of Louisiana citizens not to be shortchanged in their vote for members of the state legislature." See Bannister v. Davis, 263 F.Supp. 202 (1966). As a result of that suit, which was heard by a statutory three judge court, a special session of the Louisiana Legislature was convened and Acts 3 and 4 of the Extra Ordinary Session of 1966 were enacted. Act 3 reapportioned the Louisiana Senate and Act 4 reapportioned the Louisiana House of Representatives. Immediately thereafter the Court entered an order approving the plans for reapportionment contained in Acts 3 and 4 of 1966. The plans for both the House and the Senate contained a mixture of multi-member and single member districts. The Louisiana Legislature has been apportioned according to those Acts up to the present time. Following the 1970 United States census, the Louisiana Legislature, in accordance with the mandate of the Louisiana Constitution, undertook to reapportion itself in accordance with the 1970 census. A Legislative Committee on Re-Apportionment was appointed and worked diligently in an effort to produce a plan which would be in accordance with the 1970 census while at the time complying with the one man, one vote requirement and the other equal protection requirements of the Fourteenth and Fifteenth Amendments to the United States Constitution. All efforts of the Committee to have a special session called to consider its plans were to no avail and it was not until the Regular 1971 Session of the Legislature that the question of reapportionment was considered. There was much opposition to the Committee's plans, emanating largely from the Orleans and Jefferson Parish legislators, and it was only after many amendments had been made to the Committee's proposed plan that Acts 106 and 108 of the 1971 Regular Session emerged. The resulting plans were so obviously constitutionally defective that these present consolidated suits were instituted seeking to have Acts 3 and 4 of the Extra Session of 1966 and Acts 106 and 108 of the Regular Session of 1971 declared unconstitutional, null and void, and seeking further to have this Court "fashion a plan" of reapportionment that would be protective of the constitutionally guaranteed rights of the citizens of Louisiana. Since the proposed changes in apportionment contained in Acts 106 and 108 were creatures of the Legislature and not the Court, this Court stayed all proceedings pending submission of the plan to the Attorney General of the United States as required by Sec. 5 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c, for a determination as to whether or not the plan was racially discriminatory. This was done, and the Attorney General concluded that the plan was, in many respects, racially discriminatory. This Court whole-heartedly concurred with the findings of the Attorney General. The rejection of the plan by the United States Attorney General automatically rendered Acts 106 and 108 null and void. See Sec. 5 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c. Even if the Attorney General had not found racial discrimination, this Court would have found those Acts unconstitutional for failure to comply with the constitutional requirement of one man, one vote; for employing gerrymandering in its grossest form; for diluting the vote of certain ethnic groups, and for other reasons.

Recognizing the need for expert assistance in this troublesome and complex problem of reapportionment, this Court then appointed Mr. Edward J. Steimel, Executive Director of the Public Affairs Research Council (PAR), as Special Master pursuant to the provisions of Rule 53 of the Federal Rules of Civil Procedure and directed him "to hold hearings, if he deems it advisable, or to receive proposed reapportionment plans from the parties involved in these suits, and to evaluate those plans and to prepare and present to this Court a total,

complete plan of reapportionment of the House of Representatives and the Senate of the State of Louisiana which will most nearly comply with the one man, one vote mandate of the United States Supreme Court." Mr. Steimel neither holds nor seeks public office and his expertise in the field of reapportionment is well recognized. The three judge court in *Bannister* recognized his qualifications in this area when they noted that:

"[I]n view of the fact that the Public Affairs Research Council has prepared a reapportionment plan for Louisiana that appears, generally speaking, to be fair and rational, the defendants would carry a heavy burden if they should assert that it is impossible to reapportion lawfully unless the size of the legislative body is increased." 263 F.Supp. 202, 208.

Pursuant to this order, the Special Master held four (4) days of hearings during which over 100 persons were heard, including approximately 80 legislators. All proposed plans offered were accepted and evaluated by the Special Master. No one was denied a hearing and no one was denied the opportunity to present suggested plans. After four days of hearings, the Special Master prepared and presented to the Court his findings and conclusions in the form of a "Reapportionment Plan for the Louisiana Legislature", together with maps and supporting exhibits, all of which are filed of record in this case as Exhibits "A" through "W". Thereafter, after a thorough review and evaluation of the Special Master's report, this Court concluded that there was no manifest error therein, and that the proposed plan did, in fact, comply with all of the requirements of law, and that the plaintiffs were, as a matter of law, entitled to the relief which they sought, and that therefore the Plan for Reapportionment presented by the Special Master should be adopted and imposed by the Court upon the Louisiana Legislature. Accordingly, an order to that effect was

entered on August 24, 1971, along with written reasons therefor.

In the prayer of plaintiffs' complaint, it was requested that:

"In a form and manner to be determined by the Court, a plan of reapportionment of the Louisiana Legislature be fashioned and put into effect so as to guarantee to petitioners in the forthcoming elections their rights and privileges as citizens of the United States, to equal protection of the laws secured them by the Constitution and laws of the United States and their civil rights, secured by law."

This, in the opinion of the Court, is precisely what the Order of August 24, 1971, did. Plaintiffs, in whose favor judgment had been rendered, filed a "Motion for New Trial" on August 26, 1971, which motion, for written reasons assigned, was denied on August 27, 1971. Plaintiffs in one suit and defendants in all suits then perfected an appeal to the Fifth Circuit Court of Appeals who, in turn, on September 4, 1971, ordered this Court "to conduct an expedited hearing in open court in compliance with Rule 53(e) (2)." This Order was not received by this Court until September 7, 1971, on which date telegraphic notice was sent to all counsel of record notifying them of a hearing to be held on September 8, 1971 at 10:00 o'clock a. m. All counsel were present for that hearing and at the commencement of the hearing plaintiffs belatedly filed the objections required by Rule 53(e) (2), which were accepted and filed of record. It is the testimony adduced at this hearing of September 8, 1971, that is now before the Court. The question presented is whether or not the report of the Special Master should be accepted by the Court as is, or whether it should be altered and accepted, or whether it should be rejected completely.

### THE EVIDENTIARY HEARING OF SEPTEMBER 8, 1971

As set forth in the preceding background analysis, this hearing was held

pursuant to the mandate of the Court of Appeals dated September 4, 1971. Counsel for all parties to these suits were present and participated. Others who, at the last moment, attempted to intervene as parties or to be enrolled as additional counsel of record were denied that privilege on the ground that since the hearing was already underway, these motions simply came too late, but all were permitted to appear as amicus curiae and to file any and all proposed plans for reapportionment that they wished to file. No one was denied this privilege. A full evidentiary hearing was held with no time limits placed on anyone. At the close of the testimony the Court noted that no one had called the Special Master as a witness to question him about the plan which he had presented to the Court. Whereupon the Court announced to all counsel that Mr. Steimel was present in Court and was available to be questioned by anyone who wished to do so. It is quite significant that no one availed himself of this invitation to question Mr. Steimel as to the merits or demerits of the very plan that was supposedly under attack.

�as to the specific objections raised to the plan which this Court previously approved and adopted as one complying in every way with announced constitutional standards, it is at once apparent that the major objections come from incumbent state senators from Orleans Parish. It was primarily the objections from this same area that prevented the Legislature at its last regular session from coming up with a plan of its own that could withstand constitutional scrutiny. The main objection to the court approved plan centers around the newly created senatorial districts numbered two (2) through five (5) in Orleans Parish. However, it must be noted that *no witnesses,* other than the incumbent senators from this area, were presented in opposition to the new districts. It bears noting also that under the court approved plan, two incumbent senators find themselves having to run

against each other in Senate District 5, and two incumbent senators find themselves having to run against each other in Senate District 3, while under the plan they propose, each will have a district of his own. These are the only four witnesses who appeared to urge a change in the proposed Senatorial Districts 2 through 5, and they were apparently not concerned with any other areas of the State because they confined their objections to this area. As a matter of fact, one of the Senators reportedly refused to present objections to the East Baton Rouge redistricting even though that Parish had no counsel of record to represent it. The proposed plan for East Baton Rouge was, however, received by the Court as an amicus curiae offering and thoroughly considered as will hereinafter appear. It is, of course, incumbent upon the Court to keep in mind that those elected to office for specific terms do not thereby acquire a vested interest in the office. Furthermore, we must not lose sight of the fact that members of the Legislature represent *people* and not parishes, wards, or precincts. It is the *people* who have the constitutional right at all times to be equally and fairly represented. The office holder has no constitutional right to represent anyone except for the specific term for which he is elected. Therefore, any plan of apportionment, to be constitutionally acceptable, must pass certain basic tests. It must, within reason, conform to the one man, one vote rule. It must not be so designed as to dilute the voting strength of any person or group. And it must not employ the devise of gerrymandering in order to favor any person or group. When possible, the plan should follow parish and ward lines as well as historical and natural boundaries. But the use of such boundaries cannot be tolerated if either the purpose or the result is to deprive the people of the benefit of the one man, one vote principle or to deprive them of the anti-dilution principle now firmly established in the law. With these principles in mind, let's turn to an analysis of the

stated objections to the court approved plan.

The main thrust of the argument of the Senators from New Orleans is that there is no rational basis for the boundaries of Senatorial Districts 2, 3, 4, and 5 as proposed in the court approved plan because they violate parish and ward lines. Exhibit No. 1 and Exhibit No. 2 show Districts 2 through 5 as proposed by Senators Duplantier, O'Keefe, Hickey and Kiefer, the four Senators from this area. Their Exhibits No. 3 and 4 show the same districts as they appear in the court approved plan. While it is true that the proposed changes suggested by the Senators, none of whom, incidentally, are either plaintiffs or defendants in any of these consolidated suits, but are merely counsel of record, would result in districts contained within established ward lines whereas the court approved plan cuts across ward lines in some instances, nevertheless a closer analysis of the two proposals is required. While as a general proposition, the one man, one vote criteria concerns itself primarily with total population in the district, it is nevertheless necessary to look also at the voter registration figures in the district in order to make a determination as to whether or not the proposal meets the anti-dilution criteria. An analysis of the total population in each of the districts under consideration shows that under the court approved plan, Senate District 2 would have a negro population of 64 per cent; District 3, 16 per cent; District 4, 70.2 per cent, and District 5, 21.7 per cent, while under the plan proposed by the Senators, District 2 would have a negro population of 42.6 per cent; District 3, 43.7 per cent; District 4, 54.4 per cent, and District 5, 42.0 per cent. Thus, under the court approved plan, two of the four districts would have a majority negro population whereas under the Senators' plan, only one district would have a majority negro population. But even more significant is the fact that under the court approved plan, Senate District 2 would have a ne-gro voter registration of 51 per cent; District 3, 18 per cent; District 4, 58 per cent, and District 5, 20 per cent while under the plan proposed by the Senators, District 2 would have a negro voter registration of only 37.6 per cent; District 3, 25.7 per cent; District 4, 44.-3 per cent; and District 5, 24 per cent. Thus, under the court approved plan, two of the four districts would have a majority of registered voters of the negro race, with the attendant possibility of electing negroes to the Legislature, while under the Senators' plan, none of the four districts would have a majority of registered negro voters. Thus, while the Senators' plan probably would meet the one man, one vote standard, even though the deviations would be slightly higher than under the court approved plan, it would, in the opinion of this Court, operate to diversify the negro voting population throughout the four districts and thus significantly dilute their vote. Their plan practically eliminates the possibility of a negro being elected from any of the four districts, while the court approved plan at least gives them a fair chance in two out of the four districts. The Senators made much of the need to adhere to "historical" boundaries, which, they assert, are the ward lines in this area. They contend that any deviation therefrom is irrational and contrary to State policy. But, as brought out in the evidence, it was this policy and these "historical" boundaries that produced but two negro legislators since Reconstruction days. During the Twentieth Century only two negroes have sat in the Louisiana Legislature, and even they did not sit at the same time. One succeeded the other. The plan proposed by the Senators would help perpetuate this "historical fact" and this State "policy" while the court approved plan would tend to correct this injustice. Neither historical boundaries nor state policy nor state constitutional provisions may be used as vehicles by which to deprive the people of their constitutional right to equal protection under the law or of their

right to equal participation in the election process. The court approved plan protects these rights. The Senators' plan does not. The court approved plan seeks to protect the rights of the people while the primary purpose of the Senators' plan appears to be the protection of incumbent office holders. The Senators complain about the creation of single member districts. As of the present time, 31 states have found the single member district to be the preferable method of apportionment. In *Bannister,* this Court recognized the advantages of single member districts and recommended their use. See 263 F.Supp. at p. 209. Single member districts are always to be preferred if the use of multi-member districts tends to dilute the voting strength of any minority group. That such is the case in Louisiana could hardly be denied. By the uniform use of single member districts, and by deviating to some extent from "historical" boundaries, equal participation in the election process is made available to all citizens. The court approved plan, in the opinion of this Court, does that. The plan proposed by the Senators does not. We must give more than lip service to the right to participate in the election process, no matter whose official status might be put in jeopardy thereby. The court approved plan gives meaning to the "equal protection of the laws" guaranteed by the United States Constitution. The Senators' plan does not. The Senators argue that there is no "rationale basis" for the court approved plan. In view of the foregoing, it is understandable why they did not avail themselves of the opportunity to question Mr. Steimel as to the rationale behind the court approved plan. It is also interesting to further compare the Senatorial District 2 proposed by the Senators with the District 2 proposed by the court approved plan. In the Senators' plan we find a portion of the Lower 9th Ward, which is heavily negro, combined with New Orleans East, which is heavily white, with the two areas separated by the Mississippi Gulf Outlet

and a predominantly undeveloped area. In contrast is the court approved District 2, which combines the Lower 9th Ward with a similarly inhabited area to the west which results in a compact area in which the negro population has not been fragmented, and throughout which there is apt to be more of a community interest.

While at first blush one might question the many sided perimeter of Senatorial District 4, a closer scrutiny will reveal that this was done in order to follow precinct lines while at the same time keeping Ward 6 intact.

Primarily for these reasons, and for the further reason that there has been no showing of manifest error in the findings of fact of the Special Master, the changes proposed by the New Orleans Senators as depicted in their Exhibits 1 and 2, to the court approved plan will be rejected.

█ The next major area of dispute concerns Jefferson Parish. Mr. Francis Laurialla, a member of the House of Representatives from Jefferson Parish, testified as to what he considered to be inequities in the court approved plan. He contends that Jefferson Parish should not have to share four of its allotted representatives with other parishes. According to the 1970 census figures, Jefferson Parish should be entitled to 9⅔ seats in the House of Representatives. Under the court approved plan, that Parish is given nine seats to be filled entirely by voters within the Parish, and they participate along with other parishes in the election of four other representatives. In one of these districts Jefferson has a majority of the voting strength and thus, in effect, they may elect ten representatives and play a minor role in the election of three others. They object to the plan placing Ward 2 in House District 54 with the southern part of LaFourche Parish; Ward 6 in District 105 with Plaquemines Parish and the rural part of St. Bernard Parish; part of Ward 7 in District 88 with part of Orleans Parish, and Wards 1 and 2 with a contiguous part

of Ward 15 of Orleans Parish. In so arranging these parts of Jefferson Parish, the Special Master gave special consideration to population requirements, community of interests, accessibility of areas joined, and the resulting disruption of other districts if alternatives were resorted to. Representatives of Jefferson Parish presented no alternative plan to either the Special Master or to the Court and freely admitted that they had none. Jefferson Parish has its full share of representation under the court approved plan, and no manifest error has been shown in the plan submitted by the Special Master insofar as Jefferson Parish is concerned. Since no suggested alternative was presented, there is nothing before the Court other than the court approved plan which the Court finds constitutionally acceptable.

The plaintiff Taylor, while approving and recommending acceptance of the court approved plan, did also file Exhibits G(1) and G(2). These exhibits merely show that plans could be presented which are within acceptable deviation limits while at the same time giving the negro voters an even greater voter strength than does the court approved plan. These submissions merely tend to show that the Special Master did not draw a plan primarily to favor the negro population. These plaintiffs approve the court approved plan and hence no further comment is necessary as to them.

The same may be said of Exhibit H(i) filed by the Republican Party of Louisiana. They have no specific objection to the court approved plan but merely file Exhibit H(i) as evidence that other acceptable plans could also be presented. Attorney Murphy Bell, on behalf of the plaintiff Emmitt Douglas, State President of the NAACP, filed a "Motion to Submit Alternative Plan for East Baton Rouge Parish Senate Redistricting" wherein he proposed certain changes in Senate Districts 15 and 16. There was no evidence introduced in support of this motion nor was there any argument made in support thereof.

A study of the proposal indicates that it in no way improves on the court approved plan and since this plaintiff specifically indicated his approval of the court approved plan, no further consideration was given to this proposal.

Four exhibits were filed by the State, identified as State 1, 2, 3, and 4. No evidence or argument was presented in support of any of these exhibits. Exhibit State 1 simply proposes a change in the St. Tammany-Washington Parish area that would place Ward 7 of St. Tammany Parish in House District 74 and Ward 10 of St. Tammany Parish in House District 75. The obvious result of this proposed change would be to place two incumbent representatives in different House Districts rather than placing them in the same district as the court approved plan does. To accept this proposal would be gerrymandering in its most obvious form. The proposal is therefore rejected.

State Exhibit 2 concerns itself with Bossier Parish. It simply recommends some options that had previously been submitted to the Court in the Special Master's report and rejected. The principal objection raised is the placing of Bossier City in the same district with Shreveport wherein Bossier will be a "minority partner." No alternative to this set-up has been presented either orally or in writing. The Legislature, in its 1971 plan, handled this problem by devising a district composed of non-contiguous areas. This was even objected to by the United States Attorney General when he rejected Acts 106 and 108 of 1971. No evidence or oral argument was presented in support of State Exhibit 2 and it is once again rejected.

State Exhibit 3 concerns House Districts 19 and 20—Richland, Madison, Franklin and Tensas Parishes. Neither the purpose of nor the reason for the suggested changes were presented to the Court either orally or in writing, and thus the proposal, if it was intended to be such, contained in State Exhibit 3, is rejected.

State Exhibit 4 is simply a "Brief of Amicus Curiae" and needs no comment.

 The plaintiff Victor Bussie, who obviously appears in these suits for the purpose of protecting the interest of organized labor, just as others appeared to protect their seat in the Legislature or to protect the interests of other special interest groups, filed, through his attorney, Camille F. Gravel, Esq., Exhibits marked Bussie Exhibit 1 and Bussie Exhibit 2. Exhibit 1 is but a report of the Joint Legislative Reapportionment Committee which sets forth Proposed Plans A, B, and C, which were prepared by the Legislative Committee. These proposed plans have deviations as high as 12.34 per cent, and merely point up the fact that the Legislature was unable to apportion itself according to law. Bussie Exhibit 2 is merely a report of the Louisiana Legislative Council discussing the impact of Federal Court decisions on the question of reapportionment. Neither exhibit adds much if anything to this record. The fact is, though, that the Legislature did attempt to reapportion itself by passing Acts 106 and 108 of the 1971 Regular Session. The plaintiff Bussie did not like the job the Legislature did, and he filed one of these suits complaining that the Legislative Acts were racially discriminatory, that they did not adhere to the one man, one vote rule, that the Plan of the Legislature was bad because it used varied and inconsistent approaches to the establishment of the new districts, i. e., it used both single member and multi-member districts, and that "pure politics" appeared to be the basis for the Legislature's Plan because it was created for the benefit of incumbents rather than for the benefit of the people. These are, of course, very laudable complaints. But when this Court adopted a plan that completely eliminated all of the undesirable things complained of by this plaintiff, the Court is asked by the same plaintiff to do what, in this Court's opinion, would be simply substituting one brand of politics for another. This, the Court refuses to do. Let's look for a moment at this plaintiff's complaints as set forth in the closing argument of his attorney, Mr. Gravel. Bear in mind that neither this plaintiff nor his counsel submitted a proposed plan to be substituted for the court approved plan. They merely complain generally, without offering solutions. Mr. Gravel argued that the court approved plan violated the Louisiana constitutional concept of apportionment based upon historical ward lines. He says that because precinct lines are subject to change, they should not be used as voting district boundaries. But there is nothing sacred about State constitutional concepts of voting districts if those concepts produce districts that do not conform to the standards of the United States Constitution. The Supremacy Clause of the United States Constitution must prevail in such a situation. As we have seen, the so-called "historical" concepts referred to have permitted certain power bases to be maintained in the Louisiana Legislature; they have denied the citizenry of the State of Louisiana the benefits of the one man, one vote rule; they have, in the words of the plaintiff himself, allowed "pure politics" in many instances to reign supreme at the expense of the constitutional rights of the citizens of Louisiana; (witness the failure of the Louisiana Legislature to reapportion after each United States Census); and these "historical" concepts have successfully limited the number of negroes who could sit in the Louisiana Legislature to two in 75 years, despite the fact that according to the latest census figures, negroes make up 29.9 per cent of the total population and 21 per cent of the registered voters of the State of Louisiana. Simply stated, "historical" concepts must give way to constitutional rights even though those concepts happen to be embodied in the State Constitution. A state constitutional provision that prevents the exercise of federally guaranteed rights is simply unconstitutional. See Bannister v. Davis, 263 F.Supp. 202, 208 (D.C.La.—1966). There is no merit to plaintiff's contention that simply be-

cause "historical" ward lines have been crossed in the court approved plan, the plan itself should be unacceptable. Ward lines have indeed been crossed, and for the very good and valid purpose of eliminating the inequities complained of by Mr. Bussie in his complaint.

Mr. Gravel next says that the plan should conform to the "rational plan" set forth in the Louisiana Constitution, while still conforming to the one man, one vote rule. Our prior comments concerning "historical" concepts applies equally to this contention.

■ The next complaint is that the Court should have had the "parties to the litigation" fashion a plan instead of appointing a Special Master to do it. First of all, the appointment of the Special Master is specifically authorized by Rule 53 of the Federal Rules of Civil Procedure. Secondly, the very parties who appear to be the primary parties at interest in these suits, i. e., the Senators from New Orleans and Mr. Victor Bussie, all had an active part in the abortive attempt of the Legislature to reapportion itself in 1971. For this Court to have assumed for one moment that these parties could suddenly get together and come up with an acceptable plan after what was, with their assistance, presented to the people by the Louisiana Legislature, would have been presumptuous indeed. Neither this plaintiff nor his attorney ever suggested such a possibility until the final arguments were being heard in this case. Instead, in their suit they prayed that:

> "In a form and manner to be determined by the Court, a plan of reapportionment of the Louisiana Legislature be fashioned and put into effect so as to guarantee to petitioners in the forthcoming elections their rights and privileges as citizens of the United States, to equal protection of the laws secured them by the Constitution and laws of the United States and their civil rights, secured by law."

The Court did as these plaintiffs requested. In a form and manner determined by the Court, a plan of reapportionment was adopted which did secure to petitioners their constitutionally guaranteed rights. There is no merit to this complaint about who drafted the court approved plan.

Mr. Gravel's statement in argument that there are others more knowledgeable in the field of reapportionment deserves no comment. Suffice it to say that PAR has assisted in the apportionment of many public bodies throughout the State of Louisiana, and the Court was and is completely satisfied that Mr. Steimel is eminently qualified to perform as Special Master in this case.

Lastly, Mr. Gravel argues that there was "no reason to use single member districts" and that he "thinks it is unconstitutional." The simple answer to this is that single member districts have been approved and advocated by courts from the Supreme Court on down and 31 States have used single member districts as a means of reapportioning their legislatures. There is simply less dilution of voting strength of minority groups when single member districts are used, and, in the opinion of this Court, they are the real answer to the true one man, one vote concept enunciated by the Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

There is no legal basis for the objections raised by the plaintiff Victor Bussie. He offers no substitute plan. The prayer of his complaint has been answered in full. His objections to the court approved plan are without merit and are rejected.

■ This brings us to the last objection under consideration. Senator J. D. DeBlieux, of Baton Rouge, Louisiana, who is not a party to these suits, filed an amicus curiae brief and proposed plan for Senatorial Districts in East Baton Rouge Parish. Senator DeBlieux finds himself in the same new district with the other two Senators from East Baton Rouge Parish, and his proposed plan would extricate him from

that predicament while leaving the other two Senators to run against each other. In all fairness to the DeBlieux plan, it must be said that it is equally as good as the East Baton Rouge Parish Plan contained in the court approved plan, but not necessarily any better. Deviations are slightly lower, and neither plan tends in any way to dilute the voting strength of minority groups. The De-Blieux plan does not divide Ward 3 whereas the court approved plan does. Both plans result in equally compact districts. Had the DeBlieux plan been timely presented to the Special Master, it might well have been incorporated in the plan submitted by the Special Master to the Court. But it was not. The test is whether or not the plan presented to the Court meets constitutional requirements. The Special Master found facts and prepared a plan. His findings of fact simply cannot be disturbed unless found by the Court to be manifestly erroneous. There is no such finding here. One plan is equally as good as the other. The fact that one ward line is kept intact under the DeBlieux plan is not significant enough in this case to find manifest error in the plan of the Special Master. There is, in fact, another ward line broken in the DeBlieux plan that is not broken in the court approved plan. Thus, the Court finding no manifest error in the Senatorial District Plan for East Baton Rouge Parish as proposed by the Special Master, the substituted plan proposed by Senator De-Blieux is rejected.

## SUMMARY AND CONCLUSIONS

The actual objections raised during this hearing to the court approved Plan of Reapportionment for the Louisiana Legislature may be summarized as follows:

1. The plan fails to adhere to historical ward lines in forming some of the proposed new districts—particularly in Orleans Parish.

2. The plan uses single member districts exclusively whereas objectors prefer the use of multi-member districts.

3. Jefferson Parish is "short changed" on representation in the House of Representatives and is improperly divided in such a manner as to place certain wards of the Parish with wards of adjoining parishes to create districts.

4. A Special Master should not have been used to assist the Court in fashioning a plan of reapportionment. The answers to these objections may be summarized as follows:

1. The "historical" boundaries of voting districts in Louisiana reflect a history of racial discrimination. Adherence to the historical boundaries alluded to by objectors has been the prime reason why only two negroes have been allowed to sit in the Louisiana Legislature in the last 75 years. Historical boundaries and historical concepts, even when embodied in the State Constitution, must give way to federally guaranteed constitutional rights. The court approved plan has violated historical ward boundaries only where absolutely necessary to bring the proposed plan into full compliance with federal law.

2. Single member districts have been used exclusively in the court approved plan because they better protect the constitutional rights of Louisiana citizens. They minimize dilution of voting strength of minority groups and they make for uniformity throughout the State. Single member districts provide more compactness of districts and they result in less deviation from the one man, one vote requirement than do multi-member districts.

3. Jefferson Parish is simply not "short changed" in House representation. Their population entitles them to 9⅔ representatives. The court approved plan actually gives them 10 plus members. Combining certain areas of Jefferson Parish with other parishes has been completely justified by the necessity of complying with the one man, one vote rule. Where parts of Jefferson Parish are combined with other parishes, every consideration was given to population, economic and social interests of

the areas, and accessibility of one part of the district to the other.

4. The use of the Special Master is authorized by Rule 53 of the Federal Rules of Civil Procedure. The Special Master did not have the final approval or disapproval of the plan. He submitted a plan with certain alternatives. This Court, after many long hours of study, made the final determination of the plan which it was to adopt as its own.

 In conclusion, it is the opinion of this Court that the Reapportionment Plan for the Louisiana Legislature approved and adopted by this Court on August 24, 1971, meets all constitutional requirements. There is much evidence in the record of this case to support that plan, and there is no evidence of any consequence to justify substituting any of the proposed plans therefor. The question is not whether another plan equally as good can be drawn. The Court takes cognizance of the fact that there are many different ways in which the Legislature could be apportioned and still meet constitutional requirements. This Court simply concludes that the plan presented by the Special Master and approved by the Court does, in fact, meet all constitutional requirements. On the other hand, the Court concludes that the proposed substitute plans do not, in this case, meet constitutional requirements. The Special Master, after lengthy hearings conducted over a four day period, made his findings of fact and based thereon he prepared a plan. It is well settled that the findings of fact of the Special Master are binding upon the Court unless found to be clearly erroneous. Locklin v. Day-Glo Color Corp., 429 F.2d 873 (C.A.Ill.—1970); Leader Clothing Co. v. Fidelity and Casualty Co. of New York, 237 F.2d 7 (C.A.Kan.—1956); Eastern Fireproofing Co. v. U. S. Gypsum Co., 50 F.R.D. 140 (D.C.Mass.1970). There is no showing of any kind that the Master's findings of fact, upon which the court approved plan is based, was in any way erroneous. The ultimate adoption of the plan was made by the Court after concluding that, as a matter of law, the plan met all constitutional requirements. After these most recent hearings, this Court is more convinced than ever that the Reapportionment Plan for the Louisiana Legislature first approved by it on August 24, 1971, should once again be approved and adopted without change, and that its immediate implementation should be ordered.

Judgment will be entered accordingly and an order will be issued simultaneously therewith implementing said plan and providing for the necessary qualifying period for candidates who wish to seek election to the Louisiana Legislature in the upcoming elections.