**James MOORE et al., Plaintiffs,**

v.

**LEFLORE COUNTY BOARD OF ELECTION COMMISSIONERS et al., Defendants.**

**No. GC 71–84.**

United States District Court, N. D. Mississippi, Greenville Division.

Dec. 20, 1972.

Frank R. Parker, Jackson, Miss., Johnnie E. Walls, Jr., Greenwood, Miss., David Lipman, Oxford, Miss., for plaintiffs.

R. C. McBee, James W. Burgoon, Jr., Greenwood, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Subsequent to the decision of the three-judge court entered October 18, 1971, Moore v. Leflore County Board of Election Commissioners, 351 F.Supp. 848 (N.D.Miss.1971), the Leflore County Board of Supervisors proceeded to adopt and submit to the court for approval a plan for redistricting the five supervisors' districts in accordance with the one-man, one-vote principle. By a three to two vote the board on March 29, 1972, adopted the plan under present consideration. Thereafter objections were filed separately by the two dissenting board members, Supervisor Robert L. Kyle of District 1 and Supervisor Ray Tribble of District 2, and by plaintiffs suing on behalf of black citizens and residents, black voters and probable black candidates for public office, in the county.

Upon plaintiffs' motion, the three-judge court, originally organized to rule upon the issues of § 5 violation of Voting Rights Act of 1965, 42 U.S.C. §§ 1971 and 1973, was dissolved on September 7, 1972, and the county redistricting issue remanded to the single initiating judge for decision. After extensive dis-

covery, the court conducted a three-day evidentiary hearing. Following submission of briefs and proposed findings of fact in this three-way dispute, the case is now ripe for decision.

Practically all of the salient facts are uncontradicted or at least not in serious dispute. By the 1970 official census, Leflore County has 42,111 residents, of whom 24,373 (58%) are black, 17,550 (42%) are white and 188 (less than .1%) are of other races. The old supervisors' districts were badly malapportioned largely because of the inclusion of the county's only large municipality, Greenwood (22,400) in populous Beat 3, giving that particular district a population almost twice as great as the other four districts combined.[1] Greenwood's city population is divided almost equally between the races: 11,118 whites and 11,130 blacks. The black population of Greenwood is mainly centered in 11 enumeration districts situated in a 5 square mile area in the southeast portion of Greenwood; this section of the city has a total black population of 10,763, or 44.2% of the black population in the entire county. No other area of the county is so populated with blacks.

The plan adopted by the board was largely the handiwork of W. L. Kellum, Supervisor of District 3. Kellum resides in Greenwood, is engaged in the gasoline distributing business, and holds B. S. and B. A. college degrees. The hiring of an outside professional consultant to develop a redistricting plan was voted down by the board majority. The two members of the board who favored Kellum's plan, James D. Green and James M. Hooper, Jr., were convinced of his capability to do the work and relied upon him to devise the redistricting proposal, which the board officially adopted, whereby population close to the one-fifth

norm (8,422 persons) was assigned to each of the new districts, to-wit:

| Beat No. | | |
|---|---|---|
| 1 | 8,479 | 20.13% |
| 2 | 8,409 | 19.97 |
| 3 | 8,485 | 20.15 |
| 4 | 8,346 | 19.82 |
| 5 | 8,392 | 19.93 |
| | 42,111 | 100% |

Kellum relied upon the 1970 census data, including enumeration districts, and his population allocations are essentially correct. He failed to obtain census office separations of all enumeration districts which were split and relied upon house counts to that extent. Nevertheless, this method did not affect the accuracy of the foregoing calculations.

In fashioning district lines, however, Kellum completely ignored land area and road mileage as planning objectives and utilized narrow corridors to bring into southeast Greenwood the lines of four districts (Beats 1, 2, 3 and 5), whereby the concentrations of black residents heretofore in Beat 3 were broken up and placed in those several districts. Mr. Kellum frankly testified on the witness stand that his intent was to bring into each of the new districts the same racial ratio, i. e., 58% black to 42% white, as existed for the county as a whole, and certain enumeration districts were allocated, and in some instances divided, in order to achieve that approximate result. This was also admitted by the board's answers to interrogatories filed in the cause. No consideration was given by the board to the voting age population, or its racial composition and distribution among the new districts, but the lines were purposely drawn so as not to pit the incumbent supervisors against each other in future elections.

Prior to the adoption of the plan, the board conducted no public hearings, it did not seek the views of any former supervisors or other officials experienced in county government, and made no purposeful contact with members of

1. 

| Beat No. | | | | |
|---|---|---|---|---|
| 1 | 2,536 | Beat No. 4 | | 5,515 |
| 2 | 2,999 | 5 | | 3,410 |
| 3 | 27,651 | | | 42,111 |

the white or black communities to solicit their views. Supervisors Kyle and Tribble, however, continued to register objections to the board's plan and sought the advice of separate counsel. One of the admitted and basic features which Kyle and Tribble found objectionable was the total failure to consider either land area or road mileage as legitimate planning factors. Under the board's plan, Beat 3 was reduced to a land area size of 23 square miles (3.9% of the county as a whole), with road mileage of 28 miles (4.1%), in sharp contrast to Beat 1 with 195 square miles (33.2%) and 203.5 road miles (29.6%). Beats 2, 4 and 5 were assigned land area and road mileage of varying but generally similar proportions to Beat 1.

Other defects in the plan are readily apparent. The small hamlets of Money, Schlater and Shellmound, which are homogeneous communities, are split or divided between new Beats 1 and 2. The county road which divides the proposed Beats 1 and 2 is wholly within Beat 2, although most of the residents abutting the road reside in Beat 1. It is obvious from a casual glance at maps that Beats 1 and 2, when compared to Beat 3, would require a great deal more time and effort of a supervisor to discharge the duties of his office for supervising the district. The undisputed proof shows that the road mileage and land area for each proposed beat were computed by the county engineer after the boundaries were determined by the board majority, and no effort was made to correlate such data with the plan adopted.

Moreover, the plan is seriously lacking in compactness of the proposed districts structured only with population in mind. For example, Beats 1 and 2, when measured from within their respective boundaries, almost equal the entire length of the county, with each such district being of irregular formation. Laying aside from consideration the fact that Leflore County's road and bridge

maintenance funds have been heretofore divided equally among the county's five districts—whereby Beat 1 has maintained 133.7 road miles on the same amount of money as Beat 3 has obtained for maintaining only 84.6 road miles— the proposed plan (203.5 miles for Beat 1 and 28 miles for Beat 3) is shockingly inequitable in that regard.[2] At the time of trial, the board majority, although recognizing the inequity, had refused to commit themselves to change from a beat system to a county-wide system of road and bridge maintenance but deferred resolution of that issue until it was evaluated and determined to be "economically beneficial."

The board's plan in fact physically redistricts only two of the county's five beats. Beats 4 and 5 remain substantially unchanged from their prior boundary lines except each has a "finger" extending into Greenwood to obtain requisite population. Beat 3 was merely reduced in size to remove excess population, leaving the remainder of the district exactly as it presently exists. In contrast, Beats 1 and 2 were drastically changed with proposed Beat 1 now including a large part of the land area that was formerly in Beat 2, and Beat 2 incorporating most of the territory heretofore belonging to Beat 3. Historic boundaries and traditional groupings in those two beats, as well as in east Greenwood, were destroyed.

Prior to the passage of the 1965 Voting Rights Act only a few blacks in the county were registered to vote, and the majority of black citizens were registered to vote for the first time by federal registrars. With a background of fear and civil rights repression, blacks have minimally engaged in political activity, and no black person has been elected to public office in Leflore County. The only black resident who ever ran for the office of supervisor was a candidate who opposed Mr. Kellum in 1966. The black candidate led in the

---

2. Half of Beat 3's 28 miles are located within the corporate limits of Greenwood and are city maintained.

first primary of the Democratic party but lost in the runoff. The following year the board of supervisors changed to at-large elections, and no black person has since sought the office.

Although each new district has a black majority, the extent of that majority, by the board's plan, is materially decreased in every district other than Beat 3.[3] The evidence indicates that of the 24,374 blacks, 11,544 are under 18 years of age, leaving a voting population of 12,830, or 50% of the total black population. Of the 17,550 whites, 5,704 are under 18 years of age, leaving 11,846 whites constituting 67.5% of the total white population. However innocent may have been the board's aim in distributing concentration of black population into the various districts, the net result has been to dilute and fractionate the black voting strength in the election of public officials chosen in district balloting.

The defendant supervisors contend that their plan is meritorious and should be approved since it achieves a division of the total population in as near equal proportions for each district as possible in faithful compliance with the one-man, one-vote rule, the sole criterion for constitutional redistricting. The plaintiffs contend that the plan blatantly violates both the Fourteenth and Fifteenth Amendments since it is racially motivated and inspired by white incumbents who desire to be reelected as county supervisors from districts clearly having white voting majorities.[4] Objectors Kyle and Tribble agree with plaintiffs' contention that the plan was racially motivated but further urge that it is without merit also because it was not based on, or correlated with, road mileage and land area as legitimate factors in planning, although subordinate to the goal of population equality; they further charge that the plan ignored historic boundaries, homogeneous communities and other considerations affecting the welfare of both rural and urban residents, taking into account the duties and responsibilities of a member of the board of supervisors. The dissenting supervisors move the court to reject the board's plan and appoint, under Rule 53 of F.R.Civ.P., a special master, qualified in county redistricting matters, to formulate and submit a constitutionally acceptable plan in accordance with the court's instructions and guidelines.

Before reaching the serious questions in this case, the court will first deal with several peripheral matters. The claim by Kyle and Tribble that they were not given adequate opportunity by the other members of the board to study pertinent data—from January 1, 1972, when they took office until March 29, when the board took final action—is not well founded. The board was under a court order to act promptly and it was incumbent upon all members of the board, including the dissenters, to be diligent and eschew slow-moving, lackadaisical methods. Kellum did not intentionally withhold any data from the dissenters. While this case may demonstrate the lack of wisdom in not engaging a disinterested and qualified consultant to assist in redistricting, the board of supervisors is not precluded by law from undertaking the task itself and without outside help, provided, of course, it satisfies the well-known overriding constitutional requirements. Plaintiffs' criticism that Kellum split some enumeration districts and, to a degree, relied on house count estimates' does not invalidate a statistically accurate plan. The board's plan, therefore, should not be condemned merely because of the me-

---

3. Beat 1 reduced 78% to 58%
   Beat 2 reduced 74% to 60%
   Beat 4 reduced 76% to 55%
   Beat 5 reduced 69% to 57%
   Beat 3 increased 49% to 55%

4. Plaintiffs at the trial submitted a redistricting plan of their own, which the court refused to consider other than in impeachment of the board's plan, because of the unexcused failure of plaintiffs to file their alternate plan within the time allowed by the court.

chanical procedures utilized, and the court proceeds to consider the plan on the basis of its merit or lack thereof.

The one-man, one-vote principle for making equal representation for equal number of people a fundamental goal, Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (state legislative reapportionment), and Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (county redistricting), may not be viewed in isolation and to the exclusion of other facets of the Equal Protection Clause of the Fourteenth Amendment, or of discrete constitutional provisions. Courts must require that consideration be given to the Constitution as a whole. "As no constitutional guarantee enjoys preference, so none should suffer subordination or deletion." Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). Even though equality of population has been achieved, the board's plan cannot pass muster where it is the product of racial gerrymandering violative of the Fourteenth and Fifteenth Amendments. This principle was clearly established in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110 (1960), a case relating to a statute redefining the boundaries of the City of Tuskegee whereby no white voters and all but a few negro voters were removed from the city limits. The purpose and effect of the proposal was to fence negro citizens out of the town so as to deprive them of their preexisting municipal vote. In invalidating the legislative act, the Supreme Court said: "The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination. Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281, 1287." By equal protection standards, systematic and intentional diluting of black voting strength by gerrymandering is just as discriminatory as complete disenfranchisement or total segregation of negroes. Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965, 3-judge court). The overall criteria for valid redistricting were well summarized

recently by Chief Judge West in Bussie v. Governor of Louisiana, 333 F.Supp. 452 (E.D.La.1971), affirmed as modified 457 F.2d 796 (5 Cir. 1971), vacated sub nom. Taylor v. McKeithen, 407 U.S. 191, 92 S.Ct. 1980, 32 L.Ed.2d 648 (1972), which concerned a reapportionment plan for the Louisiana Legislature. The Court stated, 333 F.Supp. at page 456:

"Therefore, any plan of apportionment, to be constitutionally acceptable, must pass certain basic tests. It must, within reason, conform to the one man, one vote rule. It must not be so designed as to dilute the voting strength of any person or group. And it must not employ the devise of gerrymandering in order to favor any person or group. When possible, the plan should follow parish and ward lines as well as historical and natural boundaries. But the use of such boundaries cannot be tolerated if either the purpose or the result is to deprive the people of the benefit of the one man, one vote principle or to deprive them of the anti-dilution principle now firmly established in the law."

Since it is evident that both the purpose and effect of the board's plan was to divide the black population and dilute the black vote in Leflore County, the plan must be rejected for that reason alone. Indeed, it would be difficult to visualize a clearer case of racial gerrymandering with the result of invidious discrimination than obtains in the instant case. Plaintiffs have therefore carried the burden of showing that the plan, although based on equality of population, is a constitutionally impermissible one. In so holding, this court does not place its imprimatur upon concentrating blacks within one or more districts to emphasize their voting strength, but only that the race of people cannot be considered in reapportionment. "The Federal Constitution is color blind. It is equally as unconstitutional to discriminate against a white man as it is to discriminate against a colored man . . . ." Dixon v. Duncan, 218 F.Supp. 157 (E.D.Va.1963).

See Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

Furthermore, the dissenting supervisors raise substantial objections to the plan which are valid. Without doubt, factors other than numerical equality are important considerations in a county's redistricting. An instructive case relied upon by all parties is the recent Fifth Circuit decision, Howard v. Adams County Board of Supervisors, 453 F.2d 455 (5 Cir. 1972), which approved the supervisors' redistricting plan for Adams County, Mississippi. Because of analogous facts, that case is directly applicable here. As counsel for the dissenting supervisors point out, certain basic facts are common to both cases:

(a) The population concentration of each county is located within a single municipality—Natchez (64%) in Adams and Greenwood (53%) in Leflore;

(b) The total population of each county is nearly the same—Adams 37,730 and Leflore 42,111;

(c) The racial makeup of each county is roughly 1 to 1, with concentrations of black population in Natchez and Greenwood;

(d) The populous municipality of each county is located on or very near a county line—Natchez on the western edge of Adams, and Greenwood near the eastern boundary of Leflore;

(e) Large, sparsely rural areas comprise most of the land mass of each county.

In *Adams County,* the board engaged an outside consultant, Comprehensive Planners, Inc. (CPI), to prepare a redistricting plan taking into account not only population but road mileage, land area and other factors designed to equalize the responsibilities of each supervisor. Describing the plan, the Court stated:

"As the new plan was developed, therefore, each district converged in spoke-like fashion from a broad rural base into the City of Natchez. This dissection of the population concentration of the county resulted in an equal allocation of the population of Natchez among the new districts. Under the population figures available to CPI in 1970, prior to the publication of the 1970 census, the result was a plan in which substantial equality of population was reached in districts that reflected cross sections of urban and rural land areas." at 456.

The Fifth Circuit approved this approach by holding:

"Equality of population in electoral districts was a primary goal of the revision. Another objective, however, was the equalization of the responsibilities of each Supervisor in exercising their traditional function of highway and bridge maintenance. Thus, the Board instructed CPI not only to equate, as best it could, the population of the districts, but also the mileage of roads for county maintenance, and the square mile area of each district. With its land area largely rural, and its population concentrated in one urban area, the realization of *these legitimate planning objectives* dictated a plan which would consolidate urban and rural areas into each district." at 456 (Our emphasis).

A correlation of road mileage and land area, with equality of population thus assigned upon rational considerations, was sufficient to withstand an attack by black citizens that the Adams County redistricting plan was the product of racial motivation.

Since the Fifth Circuit has given high values to what it regards as "legitimate planning objectives", this court cannot overlook or excuse the failure of the Leflore County Board of Supervisors to make any effort to correlate road mileage, bridge maintenance, land area, with population or to consider natural boundaries and compactness of each district along with equality of functions on the part of each supervisor and law enforcement personnel. *Adams County,* decided January 6, 1972, was a sure guide that

the board's majority chose not to follow. The board, by considering only equality of population, took a highly superficial view of the redistricting which did not come to grips with the needs of the area and improving the structure of county government. Obviously, gross inequality in the responsibility exercised by individual supervisors among the five districts of the county, which inheres in the board's plan, is unworkable and not in the county's best interest; such a result is almost as undesirable as having malapportioned districts which ignore the rule of equal representation for an equal number of people. There is no evidentiary basis for concluding that Leflore County presents any unique or peculiar problems that preclude the use of several legitimate planning objectives other than equality of population in developing a meritorious plan. With the Adams County case as unmistakable precedent, a person qualified in redistricting matters should have little difficulty in developing a proposal that reflects cross sections of urban and rural land areas with substantial equality of population assigned to each district, and without racial gerrymandering. We may add that in proper planning, only minimal, if any, consideration is to be given the residence of incumbent supervisors in drawing district lines, since the object of redistricting is to benefit the people and not perpetuate the incumbents in office.

Finally, we conclude the motion of the dissenting supervisors that the court appoint a special master under Rule 53, F.R.Civ.P., to formulate a redistricting plan which satisfies constitutional requirements is well taken. Because no plan is before the court which can be approved, there is a need for the court to obtain expert assistance in redistricting Leflore County. Qualified expert assistance is readily available, and at reasonable cost to the county. Hence, as part of its order, the court shall appoint a special master with appropriate instructions for the develop-

ment, formulation and submission of a constitutionally acceptable redistricting plan in accordance with the views herein expressed.

Let an order be entered accordingly.