**Albert L. LIPSCOMB et al., Plaintiffs-Appellants,**

v.

**The Honorable Erik JONSSON et al., Defendants-Appellees.**

**No. 71-1451.**

United States Court of Appeals, Fifth Circuit.

April 27, 1972.

Edward B. Cloutman, III, Dallas Legal Services Project, James A. Johnston, William L. Garrett, Walter L. Irvin, Robert L. Byrd, Dallas, Tex., for plaintiffs-appellants.

N. Alex Bickley, City Atty., Ted P. MacMaster, Thomas B. Thorpe, Charles C. Wells, Asst. City Attys., Dallas, Tex., for defendants-appellees.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiffs brought suit seeking to have declared unconstitutional the city-wide, at-large system for electing members of the Dallas, Texas City Council. The district court summarily dismissed the complaint. Because we have concluded that the plaintiffs may be able to prove facts in support of their complaint entitling them to relief, we vacate the judgment below and remand the case for trial.

The Dallas City Charter requires that the city be divided into eight residential districts of City Council elections. Any person seeking election for any of the "places" on the ballot (numbers 1 through 8) corresponding to the eight districts must reside in the district from which he seeks election; three members, elected for "places" 9 through 11, may run without regard to residence. Voting for all eleven Council positions is open to all Dallas residents regardless of the district where they may reside. A candidate from any district is elected only when he receives a majority of the votes cast for councilman for the place for which he is a candidate. If no candidate from a district wins on the first ballot, the charter provides for runoff elections. There are no primary elections, and candidates are listed on the ballot by name only. Every citizen who fulfills the appropriate residence requirement, pays a fee of fifty dollars, and produces a petition containing 300 signatures is entitled to a place on the ballot.

The plaintiffs, appellants here, alleged that they were residents of a geographically definable "Ghetto Area" of Dallas. Their complaint, filed on March 10, 1971, stated two objections to the Dallas City Council Election procedure. First, the plaintiffs contended that the Council had failed to redraw the residence districts for election to the Council. This failure, the complaint alleged, violated a provision of the City Charter requiring the districts to be redrawn every two years; in addition, the unadjusted districts resulted in "substantial disparity of population among the various districts," in violation of the Equal Protection Clause of the Fourteenth Amendment. The district court disposed of this contention on the authority of our decision in Goldblatt v. City of Dallas, 5 Cir. 1969, 414 F.2d 774, and the plaintiffs have not urged it on this appeal.

The plaintiffs' second contention is the focal point of this appeal. The complaint alleged that "under the current system . . . [voters in] the Ghetto Voting Area have virtually no political force or control over Members of the

City Council, because the effect of their vote is cancelled out by other well-established and hostile interest groups in other areas of the City of Dallas." The complaint went on to allege that permitting all Dallas residents to vote for candidates in places 1–8 and for at large places 9–11 "has the invidious effect of diluting the vote of the Ghetto residents living in the Ghetto Voting Area," in violation of the Equal Protection Clause, and the Fifteenth Amendment as well.

The plaintiffs sought a temporary restraining order to enjoin the City from holding elections on April 6, 1971, in accordance with the at-large voting plan. The district court denied the TRO on March 11, 1971. The plaintiffs repeated their request for interim relief by motion for preliminary injunction. It came on for hearing on March 27, 1971. At the conclusion of the hearing, the district court denied the preliminary injunction and, on its own motion, dismissed the plaintiffs' entire cause of action, presumably for failure to state a claim upon which relief could be granted. The court stated that

> [n]either the pleadings nor tendered proof present specific facts in support of plaintiffs' claim that the Dallas at-large system has the invidious effect of diluting the racial minority voting strength depriving plaintiffs of equal protection; further, it is clear that plaintiffs cannot present facts necessary to support such a claim. (App. 109–110).

Following the dismissal below, the plaintiffs sought an injunction pending appeal and summary reversal in this Court to prevent the holding of the April 6 elections. A panel of this Court denied both requests, expressly without prejudice to the merits of the appeal.

We are fortunate enough to be able to consider this case in a light that was not available to the district court a year ago. After the district court decision, the Supreme Court handed down its decision in Whitcomb v. Chavis, 1971, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363. In *Whitcomb*, a black resident of the ghetto of Indianapolis, Indiana, sued to challenge a large multi-member district for selecting members of both houses of the Indiana legislature. Eight state Senators and fifteen state representatives were elected at large from Marion County, the county surrounding Indianapolis. The complaint in *Whitcomb*, like the complaint before us today, asserted a denial of effective respresentation to the ghetto minority. The case went to trial, and a three-judge district court ruled in the plaintiff's favor, ordering that Marion County be divided into single member districts. The district court found the residents of the ghetto area to be an identifiable group, with identifiable legislative interests, and found that ghetto residents were able to elect only a disproportionally small number of Marion County legislators. This underrepresentation, the district court concluded, resulted in an unconstitutional "dilution" of the voting power of ghetto residents.

The Supreme Court reversed the decision of the lower court. The Court began with the premise that, although not per se illegal, multi-member districts "may be subject to challenge where the circumstances of a particular case may 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.'" *Whitcomb, supra,* 403 U.S. at 143, 91 S.Ct. at 1869, citing Fortson v. Dorsey, 1965, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401, and Burns v. Richardson, 1966, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376. However, a simple showing of disparity between the numbers of ghetto residents and the number of ghetto legislators was not, said the Court, sufficient to prove the invidious "cancelling out" foreseen in *Fortson* and *Burns*.

The Court carefully defined the scope of its holding in *Whitcomb* when it noted two factors not present in that record. First, there was no allegation that the multi-member district for Marion County was "conceived or operated as purposeful [device] . . . to further racial or economic discrimina-

tion." *Whitcomb, supra,* 403 U.S. at 149, 91 S.Ct. at 1872. Compare Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; Sims v. Baggett, M.D.Ala.1965, 247 F.Supp. 96; Smith v. Paris, M.D.Ala.1965, 257 F. Supp. 901, aff'd, 5 Cir. 1967, 386 F.2d 979. Second, there were no "evidence and findings that ghetto residents had less opportunity than did other Marion County residents to participate in the political processes or to elect legislators of their choice." 403 U.S. at 149, 91 S. Ct. at 1872. There was nothing in the record to indicate that poor Negroes were "not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on those occasions when legislative candidates were chosen." *Id.* Nor did the evidence "purport to show or the court to find that inhabitants of the ghetto were regularly excluded from the slates of both major parties." A close reading of Whitcomb v. Chavis convinces us, then, that the Supreme Court's decision there was carefully worded so as not to foreclose all constitutional attack upon at-large voting schemes.

■ A complaint may not be dismissed for failure to state a claim on which relief may be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 1957, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84. This Court has "stated, explained, reiterated, stressed, rephrased, and emphasized" the *Conley* rule. Cook & Nichol, Inc. v. The Plimsoll Club, 5 Cir. 1971, 451 F.2d 505; Webb v. Standard Oil Co., 5 Cir. 1969, 414 F.2d 320; Millet v. Godchaux Sugars, 5 Cir. 1957, 241 F.2d 264; Barber v. Motor Vessel "Blue Cat", 5 Cir. 1967, 372 F.2d 626. Moreover, we have specifically cautioned against "the unsoundness— both administratively and substantively —of trying, in the orbital atmosphere of this dynamic era, to resolve new, but serious, questions of constitutional law on barebones pleadings . . . Courts ordinarily should grapple with these problems on a factual record." Pred v. Board of Public Instruction of Dade County, Florida, 5 Cir. 1969, 415 F.2d 851.

■ Construed in the light of Whitcomb v. Chavis most favorable to the plaintiffs, the complaint before us was not vulnerable to summary dismissal. We rest our holding on the possibility that the plaintiffs might succeed in proving that the Dallas City Council election plan is a purposeful attempt by the white majority or the Dallas city fathers to fence ghetto area residents out of the City Council. The complaint suggests as much when, in paragraph XIV, it recites that "[l]ong years of systematic and deliberate oppression, discrimination, enforced poverty and political neglect have deprived the residents of the Ghetto Area of the rightful rewards of citizenship in the City of Dallas." In the recent *Texas Legislative Apportionment Cases,* a three judge district court of Texas federal judges has recalled the "innumerable instances, covering virtually the entire gamut of human relationships, in which the State [of Texas] has adopted and maintained an official policy of racial discrimination against the Negro." Graves v. Barnes and consolidated cases, W.D.Tex.1972. On the scant record before us, we cannot say whether the plaintiffs may in the end be able to convince the trier of fact that the Dallas plan embodies a scheme of purposeful discrimination against Ghetto residents. It is surely too early in the day to conclude that such proof is impossible. We have no doubt that the plaintiffs would be entitled to relief if they were able to demonstrate that the Dallas at-large election system was "conceived or operated as purposeful devices to further racial or economic discrimination." *Whitcomb* and cases cited, *supra.*

Because the record before us is so devoid of concreteness, we do not extend our holding in the present case more than we must—that is, we hold only that

the plaintiffs would be entitled to relief if they show purposefulness. We assume, however, that any trial of this cause will explore fully the other avenue expressly left open by the Supreme Court in Whitcomb v. Chavis: whether "Ghetto Area" residents have been effectively excluded from participation in the process of selecting city council members. The district court in the *Texas Legislative Apportionment Cases, supra,* found that ghetto residents were frequently ignored in the selection of Democratic party candidates for the state legislature from Dallas. Elections to the Dallas City Council are theoretically non-partisan; the City charter bars primary elections and the facsimile ballot in the record indicates that no party designations appear on the ballot. Still, we think it possible that the plaintiffs may demonstrate facts indicating denial of effective participation in the political process. It may be—we cannot say—that election to the Dallas City Council is only nominally non-partisan; that the major parties or similar political groups endorse candidates for election; that there is high correlation between endorsement and victory in the election; and that the interests of the Ghetto Area are substantially ignored in determining a slate of endorsees. It may also be that ghetto candidates, and thus the ghetto itself, are effectively fenced out of the City Council election process by the high cost of city-wide campaigning. See *Texas Legislative Apportionment Cases, supra.* We do not know if the plaintiffs wish to pursue the post-*Whitcomb* avenue of defining exclusion from the electoral process. We certainly do not know whether they will be able to succeed in proving that they are in fact excluded by means any of the practices we have touched upon. But we do think it best that plaintiffs be given the opportunity to make their case on these points at the trial required to be held on the issue of intention.

We have considered the plaintiffs' contentions only insofar as they may state a violation of the Fourteenth Amendment. Because we have concluded that the plaintiffs may be able to prove a violation of that Amendment, we need not decide whether a trial would also be necessary to put flesh on the plaintiffs contention that the Dallas plan violates the Fifteenth Amendment to the Constitution as well. Finally, we need not consider the complex remedial problems conceivably arising from an ultimate determination in the plaintiffs' favor. There will be time enough to resolve such problems should they ever actually arise.

Vacated and remanded for proceedings not inconsistent with this opinion.