James **MOORE** et al., Plaintiffs,

v.

**LEFLORE COUNTY BOARD OF ELECTION COMMISSIONERS** et al., Defendants.

No. GC 71–84–K.

United States District Court,
N. D. Mississippi,
Greenville Division.

June 4, 1973.

⬩18

610

David M. Lipman, Oxford, Miss.,
Frank R. Parker, Jackson, Miss., Johnnie
E. Walls, Jr., Greenwood, Miss., for
plaintiffs.

R. C. McBee, Greenwood, Miss., for
defendant Board of Supervisors; James
W. Burgoon, Jr., Greenwood, Miss., for
defendants' dissenting supervisors.

## MEMORANDUM ORDER

KEADY, Chief Judge.

The court on May 11, 1973, conducted
an evidentiary hearing on the plan sub-
mitted by the special master for the re-
districting of supervisors' districts of
Leflore County, Mississippi, matters re-
lated thereto, and objections filed both
by the defendant Board of Supervisors
and the plaintiffs. Two dissenting
supervisors, Robert L. Kyle and Ray
Tribble, concurred in the report. Fol-
lowing the introduction of evidence, oral
and documentary, and arguments of
counsel, the court now withdraws its
bench rulings made orally at the conclu-
sion of trial and makes the following
findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

1. The redistricting plan devised by
Hoyt T. Holland, Jr., Special Master
heretofore appointed by this court, di-
vides the total population of Leflore
County (42,111 by the 1970 U. S. Cen-
sus) into 5 almost equal portions. When
compared to an "ideal" of 8,422.2 per-

1. Prior stages of this case are reflected in
two published opinions, Moore v. Leflore
County Board of Election Com., 351 F.
Supp. 848 (N.D.Miss.1971, 3-judge court),
and 361 F.Supp. 683 (N.D.Miss.1972).

sons (⅕th of whole), the districts are structured as follows:

| District Number | Population | % of Total | % Variance From Ideal |
|---|---|---|---|
| 1 | 8,470 | 20.11 | +0.57 |
| 2 | 8,492 | 20.17 | +0.83 |
| 3 | 8,384 | 19.91 | −0.45 |
| 4 | 8,415 | 19.98 | −0.09 |
| 5 | 8,350 | 19.83 | −0.86 |
| | 42,111 | 100.00 | |

2. Having thus achieved equality of population as closely as possible, the master also equalized as nearly as practicable under the circumstances such subsidiary factors as road and bridge mileage and land area, assigning to each district substantial numbers of both urban and rural residents. With precise population equality as the primary goal and allocation of substantially equal road and bridge mileage and land area as secondary considerations, the master caused to be split only a minimal number of enumeration districts; and whenever enumeration districts were split, he obtained census office separations to assure accuracy of ascertaining population thus affected. In some split enumeration districts, only territory and not people were involved; in another case an enumeration district was split to provide an appropriate polling place. Accuracy in counting population was, however, maintained in dividing the enumeration districts determined to be necessary to accomplish proper redistricting.

3. To the maximum extent possible, the new district lines follow either natural boundaries such as rivers and bayous, or man-made boundaries like highways and roads, or other well known landmarks as section lines traditionally used to mark beat boundaries. The boundaries utilized to form the new districts are sensible, do not confuse, and may be readily understood by persons residing within the affected areas. Obviously, in dealing with a county of the configuration of Leflore County and with its population center contained in a single city, Greenwood, which is situated near the county's eastern boundary, maximum compactness could not be achieved for the newly formed districts. Yet, the master's utilization of a corridor into Greenwood from each rural land mass was altogether proper and rational, especially to achieve a division of population and approximate equalization of road mileage and land area. Criticism has been chiefly directed at proposed District 1, which is virtually compact except for the long finger or corridor which extends into North Greenwood. To a lesser extent the same observation may be made of other districts, particularly Districts 3 and 4, while District 5 has marked irregularities on the south boundary due largely to the configuration of the county line. Even so, the evidence supports a conclusion that the lines of all districts are well within the bounds of reasonable discretion and do not offend good planning. The criticism that some districts are not compact because of relatively lengthy perimeters is without factual or logical support, considering the physical conditions that prevail. The districts are indeed as reasonably compact and convenient as practicable for them to be made and still accomplish legitimate planning objectives for Leflore County. Moreover, the district lines are in every case contiguous and are reasonably symmetrical.

4. The road mileages as ascertained by the special master are reliably accurate. He has accounted for both paved and unpaved roads, and to an extent considered traffic counts. The road compilations disclosed in his report were made after conferring at length with the county engineer. No evidence has been submitted which substantially contradicts the accuracy or reliability of the data compiled by the master respecting road and bridge mileages and land area. From the standpoint of considering a supervisor's responsibility under state law and practice, all those obligations and responsibilities which the supervisor primarily owes to the district in which he resides and from which he was elected are, by the plan, evenly or as near evenly distributed as possible among the five supervisors.

5. The special master's plan for county redistricting, devised to achieve population equality and approximate equalization of road and bridge mileage and land area, was structured without regard to the race or political affiliations of the county's residents. Persons allocated to each of the five districts were assigned logically by the location of their places of residence, and generally placed in a district by a rule of proximity. Thus, race was wholly disregarded as a factor in fashioning district lines. The master, having first structured as heretofore outlined the proposed district lines, then ascertained the racial distribution of the general population and voting age population of each new district. Also, he determined from the best available information the racial distribution of those persons who are presently registered voters in each such district. Accordingly, the data thus ascertained consist of the following facts:

(a) The racial distribution of the population is:

| District Number | White | % | Non-white | % | Total |
|---|---|---|---|---|---|
| 1 | 6331 | 75 | 2139 | 25 | 8470 |
| 2 | 3306 | 39 | 5186 | 61 | 8492 |
| 3 | 2742 | 33 | 5642 | 67 | 8384 |
| 4 | 3043 | 36 | 5372 | 64 | 8415 |
| 5 | 2128 | 25 | 6222 | 75 | 8350 |
| | 17550 | 42 | 24561 | 58 | 42111 |

(b) The racial distribution of the voting age population is:

| District Number | White | % | Non-white | % | Total |
|---|---|---|---|---|---|
| 1 | 4278 | 81 | 994 | 19 | 5272 |
| 2 | 2191 | 45 | 2667 | 55 | 4858 |
| 3 | 1930 | 38 | 3099 | 62 | 5029 |
| 4 | 2019 | 41 | 2927 | 59 | 4946 |
| 5 | 1399 | 30 | 3282 | 70 | 4681 |
| | 11817 | 48 | 12969 | 52 | 24786 |

(c) The racial distribution of presently registered voters is substantially thus:

| District Number | White | % | Non-white | % | Total |
|---|---|---|---|---|---|
| 1 | 4170 | 88 | 569 | 12 | 4739 |
| 2 | 1779 | 49 | 1833 | 51 | 3612 |
| 3 | 1551 | 42 | 2156 | 58 | 3707 |
| 4 | 1713 | 50 | 1736 | 50 | 3449 |
| 5 | 1172 | 34 | 2276 | 66 | 3448 |
| | 10385 | 55 | 8570 | 45 | 18955 |

6. Analyzing the above figures, the court rejects the complaint that including in District 1 that portion of North Greenwood bounded on the south and east by the Yazoo River and populated almost exclusively by white persons results in an impermissible racial imbalance. It was wholly logical for that portion of North Greenwood to be brought into District 1 if the district was to be served with a corridor into the metropolitan center, a plain necessity for achieving population equality. Although new District 1 has a white majority of 75%, a voting age population majority of 81%, and a registered white voter majority of 88%, almost the direct reverse obtains in District 5. Non-whites in District 5 have a 75% population majority, a 70% voting age population majority and a 66% registered voter majority. As in the case of North Greenwood concerning District 1, a large portion of Southeast Greenwood populated by blacks was brought into District 5 since that area directly lay within the path of the corridor extended into Greenwood. Districts 2, 3 and 4 also have substantial majorities in black population, and significant majorities in voting age population. In Districts 2 and 3 blacks have a majority of registered voters.

7. The court finds unfounded the contention that, by the special master's plan, concentrations of blacks residing within Greenwood have been segmented into the various districts, thus resulting in the dilution of their political strength. This was neither the aim nor effect of the plan upon the urban population. In determining the aforesaid racial percentages, the special master (Ex. 10) satisfactorily accounted for whatever racial division occurred as to the enumeration districts inside the municipal limits of Greenwood and tabulated the racial effects thereof. The concentration of blacks in District 5 (Southeast Greenwood) and District 2 (Northeast Greenwood) readily establish the political potential of blacks residing within such districts. To a lesser extent, the same observation may be made as to blacks residing within District 3

(Southwest Greenwood). The plain evidence refutes the notion that black citizens are hindered from engaging in significant political activity, or otherwise discouraged from seeking the office of supervisor or other district office because of racial discrimination or bias. The special master's plan is devoid of racial overtones, either by design or effect, and is racially nondiscriminatory.

8. As a necessary adjunct to the proposed redistricting, the master has submitted certain changes in election precinct lines and polling places. Some alterations must inevitably be made. The court finds all suggested changes to be reasonable, practicable and racially nondiscriminatory, except it rejects the VFW Club selected as the polling place in District 5 for Southeast Greenwood. The VFW Club, a private organization, has a membership of whites only; and black citizens, who constitute the voter majority in Southeast Greenwood, may likely be inhibited or embarrassed in free access to vote at that location. The court will, therefore, select another place more suitable for both races as a polling place for Southeast Greenwood.

## CONCLUSIONS OF LAW

1. The redistricting plan submitted by the special master[2] is constitutionally adequate and fully satisfies the one man-one vote rule required by the Fourteenth Amendment.

2. The redistricting plan is devoid of invidious racial discrimination or bias and does not diminish the right of black citizens to vote, contrary to the Fifteenth Amendment.

3. The redistricting plan devised in accordance with prior instructions of this court is determined to be for the overall benefit of Leflore County, including the different elements and segments of its population, and represents a substantial improvement in the structure of county government.

4. The changes in certain boundaries of election precincts and polling places proposed by the special master to supplement and to carry into effect the requirements of county redistricting, except as to the polling place for District 5 in Southeast Greenwood, are lawful and valid arrangements.

5. The court concludes that the special election of new supervisors should not be by at-large election as requested by a majority of the supervisors, but that such election should be by districts. Although a federal district court has the power to order at-large elections in the exercise of its equity jurisdiction, we do not see any special or other circumstances of import to justify an at-large election for the county supervisors. A proper redistricting plan now having been approved, ample time remains for the holding of orderly elections by districts. Not only is the traditional method in Mississippi for choosing supervisors on a district basis, but substantial reasons exist to prefer that method to at-large elections. The supervisor from each district represents a readily ascertainable constituency; he is regarded by the residents of his district as their officer, or the supervisor to whom they primarily look to resolve problems specially affecting their particular district. Although the board of supervisors does exercise general, legislative functions which affect the county as a whole, nevertheless, the individual supervisor is usually regarded as a beat or district officer who perhaps functions best when directly representing and reflecting the views of the residents within his district. Regardless of abstract considerations, however, the record in Leflore County fairly requires the conclusion that blacks have been discouraged in political activity or from offering for the office of county supervisor when elections are conducted on an at-large basis. Under the new districts approved by this court, there is no reason

2. This approval takes into account the post-trial corrections to the plan filed by

the special master to rectify formal and typographical errors disclosed at trial.

why all qualified black voters should not freely participate in election processes and, if interested, run for supervisor or other beat office without being handicapped or impeded because of race. To order at-large elections, on the other hand, would diffuse black political strength in support of black candidates running for such offices; and this is impermissible because of the admittedly low participation by blacks in past electoral processes. The court, in the exercise of its discretion, thus determines that the ends of justice would be best served by returning Leflore County to the traditional district basis for the election of county supervisors, and holds that supervisor elections be held and continue to be held by districts in Leflore County until such time as the Attorney General of the United States may approve, pursuant to § 5 of the Voting Rights Act of 1965 (42 U.S.C. § 1973c, as amended June 22, 1970, P.L. 91–285, 84 Stat. 315), Miss.Code § 2870, as amended by Chap. 290, Mississippi Laws of 1966, authorizing the board to provide that supervisors might be elected by at-large elections.

■ 6. Finally, the court concludes that its order approving the redistricting plan of Leflore County, the location of new precinct lines and of polling places satisfies all requirements of federal law and the United States Constitution and is operative without submission of any portion thereof to the Attorney General of the United States or for favorable determination by declaratory action in the United States District Court for the District of Columbia, because this court's order is not within the reach of § 5 of the Voting Rights Act. Conner v. Johnson, 402 U.S. 690, 692, 91 S. Ct. 1760, 29 L.Ed.2d 268, 270 (1971); Zimmer v. McKeithen, 467 F.2d 1381 (5 Cir. 1972); Sheffield v. Itawamba County Board of Supervisors, 439 F.2d 35 (5 Cir. 1971); Conner v. Board of Supervisors of Oktibbeha County, Miss., 334 F.Supp. 280 (N.D.Miss.1971). Thus, this court dispenses with any requirement that the special master's plan

be submitted to the Attorney General of the United States for his study and approval, and holds such plan and all component parts approved by this Order, shall become immediately effective.

### ORDER

It is, therefore, ordered as follows:

1. The redistricting plan of Leflore County, Mississippi, together with changes in certain election precinct lines and polling places (except the polling place for Southeast Greenwood) as proposed by the special master, be and the same is hereby adopted and ordered to be placed into effect immediately. East Elementary School is designated by the court as the polling place for Southeast Greenwood in District 5.

2. The court allows to Hoyt T. Holland, Jr., as reasonable compensation for his services as special master $9,007.50 and also reimbursement of $3,907.79 for out-of-pocket expenses, making a total amount of $12,915.29, which sum the defendant Board of Supervisors is ordered to pay to Hoyt T. Holland, Jr., within 60 days from this date.

3. The court reserves until the expiration of time for an appeal by any party the entry of a comprehensive order directing the Board of Supervisors and county election officials to take all necessary and appropriate steps to carry into effect the redistricting and establishment of election precinct lines and polling places, by orders entered upon official minutes of the board, making transfers on poll books, publicizing all changes required by this order, fixing a date or dates for the holding of a special election, including runoff election, for the office of supervisor, and prescribing methods and procedures for the holding of a special supervisors' election in conformity with state law. In case of an appeal, the court shall delay further order pending the outcome of the appeal. In event no appeal is taken, the court shall without delay summon counsel to attend a conference looking to the adoption of a full, comprehensive order for

the holding of a special election at the earliest practicable date.

4. The court reserves for later decision the issue of attorney's fees and costs to the successful parties. Furthermore, it retains continuing jurisdiction in the cause for the purpose of issuing such other and further supplemental orders as may be necessary and appropriate for final disposition of all issues in the case.